# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3914 | **DATE** | 4/2/2003 |
| **CASE TITLE** | | Krista P., et al. vs. Manhattan School District, et al. | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiffs' motion for summary judgment [41-1] is denied. The Court grants summary judgment in favor of the Defendants Illinois State Board of Education and the Manhattan School District. Defendants Manhattan School District's motion for admission of evidence [51-1] and motion to strike [52-1] are granted in part and denied in part. Plaintiffs' motion to admit additional information to the record 42-1] is denied. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | APR 03 2003 | |
| ✓ | Docketing to mail notices. | | | date docketed | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | 7a |
| | Copy to judge/magistrate judge. | | | | |
| RO | courtroom deputy's initials | U.S. DISTRICT COURT | | date mailed notice | |
| | | 03 APR -2 PM 1:06 | | | |
| | | 01 Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KRISTA P., and MR. AND MRS. P.,
individually and as parents and next
friends of KRISTA P.,

    Plaintiffs,

    v.

MANHATTAN SCHOOL DISTRICT
and the ILLINOIS STATE BOARD OF
EDUCATION,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 02 C 3914

Judge Ruben Castillo

**DOCKETED**

APR 0 3 2003

## MEMORANDUM OPINION AND ORDER

Plaintiffs Krista P. and her parents Mr. and Mrs. P. ("Parents") seek judicial review of a Hearing Officer's ("HO") decision under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Presently before the Court is Plaintiffs' motion to admit additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(B)(ii) and motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendant Manhattan School District 114 ("District") also moves to admit additional evidence and to strike portions of Plaintiffs' submissions on summary judgment. For the reasons set forth herein, the Court denies Plaintiffs' motion to admit additional evidence. (R. 42-1.) The Court also denies in part and grants in part the District's motion to admit additional evidence, (R. 51-1), and motion to strike, (R. 52-1). Further, the Court denies Plaintiffs' motion for summary judgment, (R. 41-1), and grants summary judgment to the Illinois State Board of Education ("ISBE") and the District.[1]

---

[1] The Court construes the ISBE and District's responses to Plaintiffs' motion for summary judgment as cross-motions for summary judgment. Cross-motions are the standard vehicle by which courts review administrative decisions. *Dale M. v. Bd. of Educ. of Bradley-*

During the 2000-2001 school year, Krista attended the sixth grade at the District's Manhattan Junior High School. Krista had been receiving accommodations under Section 504 of the Rehabilitation Act of 1973 ("Section 504") since 1996, but had been found ineligible for special education services after case study evaluations ("CSE") in the first and fourth grade. In December 2000 Parents requested that the District conduct another CSE of Krista because of continued concerns with Krista's performance during the sixth grade. The District rejected Parents' request for another CSE and in response Parents requested an independent educational evaluation ("IEE"). The District in turn requested a due process hearing to deny Parents' request for an IEE. After a hearing on this issue and other issues submitted by Parents, HO Gail Tuler Friedman issued a decision concluding that the 1996 and 1999 CSEs and the decision to deny a

---

*Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 816 (7th Cir. 2001).

[2] The following facts are taken from the parties' Local Rule 56.1 submissions and the administrative record. The Court has carefully reviewed the District's motion to strike Plaintiffs' statement of facts, motion and memorandum. As noted in the District's motion to strike, many of Plaintiffs' facts are unsupported by record evidence or contain inaccurate citations to the record. In its response to Plaintiffs' statement of facts, the District provides the correct citations for some of these incorrect and unsupported facts. In addition, the Court reviewed the administrative record to confirm facts and fill gaps in Krista's history. Thus, some of Plaintiffs' unsupported facts nevertheless have been included in this section; others have been disregarded as unsupported. Furthermore, we disregard a number of Plaintiffs' facts—¶¶ 63, 66 and 70–as inadmissible hearsay. We reject, however, the District's invitation to strike Plaintiffs' motion and memorandum. While Plaintiffs' motion and rambling, incomplete memoranda do not comply with the dictates set forth in this Court's opinion in *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000), and further lack clarity, cohesiveness and sometimes relevance, Plaintiffs' submissions have already been stricken once for failure to comply with our local rules, (*see* R. 24, Sept. 16, 2002 Order). Given the history of this litigation, which the Court has attempted to expedite for Krista's sake, we doubt that Plaintiffs' attorneys would submit more satisfactory pleadings; thus, we decide the dispute on the pleadings before us. Accordingly, except as otherwise noted, the District's motion to strike is denied. (R. 52-1.)

CSE in 2000 were appropriate, that Krista was not entitled to an IEE at public expense and that the District had not violated various federal and state regulations. Parents currently challenge several aspects of the HO's decision. Initially, we summarize the record of Krista's educational history that was before the HO.[3]

## I. Background

### A. Krista's First Grade Case Study Evaluation

In the fall of 1994 Krista entered kindergarten at the District's Anna MacDonald Elementary School, which she attended through the fifth grade. On December 12, 1995, when Krista was in the first grade, Mrs. P. referred Krista for a CSE, complaining that Krista was depressed over her inability to retrieve knowledge and that her self-esteem was challenged. The District's Review Intervention and Assistance Team ("RIAT"), a consultation team of educational professionals, considered Mrs. P.'s referral. At the time of the RIAT consultation, Krista had been placed in the remedial reading group of the general education program due to her teacher's concerns with her reading and attending skills. Because of the teacher and parents' concerns, the RIAT members decided to conduct a CSE, for which Mrs. P. provided formal consent on January 11, 1996. The signature page of the consent form states that Julia Wheaton, the school psychologist, explained parental rights and responsibilities, including the procedures for requesting an impartial due process hearing, to Mrs. P. Furthermore, Wheaton testified at the due process hearing that she explained the process and parental rights to Mrs. P.

---

[3] This history is gleaned from the administrative record, including from the various reports and the testimony from the due process hearing. Testimony from the hearing is noted as such.

3

The District then conducted a comprehensive CSE of Krista.[4] The District also
conducted a psychological evaluation to assess Krista's cognitive functioning and educational
and learning process. Wheaton administered the Wechsler Intelligence Test for Children III
(WISC III), the Wechsler Individual Achievement Test (WIAT) and the Visual Motor Integration
(VMI) test. The tests part of the 1996 CSE were administered in Krista's native language,
English, and were non-discriminatory on a racial and cultural basis.

On February 26, 1996, the District convened a Multi-Disciplinary Conference (MDC) to
review the components of the CSE and to determine whether Krista was in need of special
education services. The District sent Parents a Parent Notification of Conference form that stated
that they should call Wheaton if they had any questions, along with an attached form explaining
the procedural safeguards available to parents. Mrs. P., along with Wheaton, Krista's teachers
and special education teachers, participated in the MDC. Based on the reports of Krista's first
grade teacher and remedial reading teacher and Wheaton's observation of Krista in the classroom
on three occasions, the MDC agreed that the remedial reading program was adequately
addressing Krista's needs. The MDC participants also reviewed the results of the standardized
tests. As Wheaton explained at the due process hearing, while there was a discrepancy between
Krista's superior performance (non-verbal) intelligence quotient (IQ) of 117 and her average
achievement test scores of 89 to 100, Krista's achievement test scores were commensurate with

---

[4] A comprehensive CSE includes "an interview with [the] child; consultation with [the
parent]; a social developmental study, including an assessment of adaptive behavior and cultural
background; a report of [the] child's medical history and current health status; vision and hearing
screenings; a review of [the] child's academic history and current educational functioning; an
educational evaluation of learning processes and level of educational achievement; and an
assessment of [the] child's learning environment." (R. 30-31, Admin. R. at 797, CSE Consent
Form.)

her average verbal IQ of 95. Verbal IQ, Wheaton noted, is a better indicator of a child's school performance than non-verbal IQ. The MDC thus concluded that Krista did not need special education services; Krista's accommodations were appropriate, she was earning average to above-average grades and she was adequately progressing in the general education curriculum. Further, although Krista had been recently diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and had begun taking Ritalin, the MDC decided that it could not make an informed decision on Krista's eligibility for special education services without first giving that medical intervention time to take effect.

At the conclusion of the MDC, Mrs. P. received a copy of the MDC report along with a Parent Notification of Conference Recommendations form. Mrs. P. testified that the report contained: (1) a description of the action refused: Krista's placement in special education; (2) an explanation of the refusal: Krista was achieving in the average to above-average range and there were no adverse effects on her education performance; (3) a description of each evaluation, procedure, test, record and report used as a basis for the decision; and (4) a review of some additional considerations for students suspected of having learning disabilities. Another explanation of parental rights was attached to the notification form, which requested that Mr. and Mrs. P. review their rights and contact the school principal if they had any questions. Wheaton also reviewed parental rights with Mrs. P.

### B. Section 504 Plan Implemented: Grades One through Four

Although Krista was found ineligible for special education services in 1996, she was found eligible for an educational plan under Section 504. Accordingly, the District conducted a Section 504 meeting on March 12, 1996 to develop an educational plan for Krista. The Section

504 team affirmed that Krista did not need special education and implemented several educational strategies to aid Krista, including continuation of the remedial reading program, teacher proximity during instructions and monitoring during seat work, positive comments to improve Krista's self-esteem, reduction and self-correction of math assignments, allowance for grade modification and no grade penalization for letter reversals and incorrect capitalization. The meeting report also notes that Krista's teacher had observed great improvement since Krista started Ritalin about two weeks prior. By the end of first grade, Krista's teacher reported that her attentiveness had improved; her reading grade was an A- and her other grades were As and Bs.

Krista's Section 504 plan remained in effect during the second grade, where she earned A and B year-end grades in all subjects. Krista's school principal testified that she was not placed in the remedial reading program after the first grade; Krista's second-grade report card does not reflect that Krista was in the remedial reading group.

In the fall of 1997 during Krista's third-grade year, the District held another Section 504 meeting to review Krista's performance under the Section 504 plan. The team concluded that because of Krista's past and current school performance, she would receive general education adaptations to help her succeed. With the adaptations in place, Krista received A and B grades, including a B+ in the average reading group. At the end of Krista's third-grade year, the District held another Section 504 meeting and concluded that Krista would continue in regular education classes with modifications (*e.g.*, a seat near the front of classroom, shortened assignments if necessary, extra time for test completion).

## C. Krista's Fourth Grade Case Study Evaluation

In the fall of 1998, Mrs. P. referred Krista for a second CSE because she was concerned with Krista's learning process and what she perceived as dyslexic-type patterns in Krista's work. Prior to this second referral, Wheaton again explained Mrs. P.'s rights to her. In response to Mrs. P.'s referral, Principal Butters met with Mrs. P. to discuss the need for a CSE. Based on his discussions with Krista's teachers and his review of her grades, Principal Butters felt that a CSE was not warranted, but decided to go ahead with one because Krista had not been tested since the first grade and he hoped they could identify any problem, if there was one, and alleviate Mrs. P.'s concerns. As part of the CSE, the District conducted speech, language and psychological evaluations, including standardized tests, as well as an evaluation of Krista's educational and learning processes.

On January 28, 1999, the District held a MDC to discuss the results of Krista's second CSE. Mrs. P. and members of the school staff participated in the MDC and reviewed all the CSE components. The team noted that Krista was earning A and B grades in all subjects, including in the second-to-highest reading group and in English without any modified instruction. Krista's fourth grade teacher also reported that Krista's written expression was "fine." (R. 30-31, Admin. R. at 823, MDC Report.) The MDC further noted that Krista's test scores were commensurate with her first grade CSE results. Once again, Krista's performance (non-verbal) IQ of 121 exceeded her verbal IQ of 101 and her achievement test and VMI scores were in the average range. Krista's speech and language evaluation results were largely consistent with the results of the psychological evaluation.

The team once again concluded that Krista was not in need of special education services. Specifically, Wheaton testified that although there was an aptitude-achievement discrepancy, Krista's achievement scores were in the average range and the discrepancy did not significantly impact her school performance because she maintained average to above-average grades. The MDC report recommended the continuation of the Section 504 accommodations to help Krista succeed in school. Mrs. P. received a written notice that Krista had been found ineligible for special education services as well as the MDC report, which explained the various tests performed and why Krista was ineligible for services.

### D. Section 504 Plan Continued: Fourth and Fifth Grade

During the fourth and fifth grades, Krista continued to receive As and Bs, including in the second-highest of four reading groups. In the spring of Krista's fourth and fifth grade years (1999 and 2000), the District held Section 504 meetings to review and update her Section 504 plan. Krista's accommodations were found to be successful at both meetings and her Section 504 plan was continued. Krista's fourth grade teacher opined that Krista did very well in class, that her writing was adequate and that she worked at a slow pace because she was a perfectionist. Krista's fifth grade teacher concurred that Krista was a good student but that she had problems paying attention during class. Krista's average standardized test scores during the fourth and fifth grades were in the average to above-average range, although the tests revealed that she had not mastered a few subtest areas. Wheaton testified, however, that the test results showed no areas of concern.

### E. Referral for a Third Case Study Evaluation

In May 2000 Mrs. P. sent Principal Butters a letter requesting a third CSE or "for the school to suggest an outside evaluation by an LD specialist in reading." (*Id.* at 840, Mrs. P. Letter to Principal Butters.) Although Principal Butters reported to Mrs. P. that Krista's teachers did not feel another CSE was warranted, he sent Mrs. P. the CSE referral forms on May 31, 2000, noting Mrs. P.'s right as a parent to request a case study evaluation. He also informed Mrs. P. that a committee would review the forms at the beginning of the 2000-2001 school year.

Krista started sixth grade at the District's Manhattan Junior High School in the fall of 2000. In her first quarter, Krista earned As and Bs and a C in Social Studies. Krista received modified instruction in Math and her Section 504 accommodations included extra time and the acceptance of re-do's on tests and homework. In December 2000 Mrs. P. formally referred Krista for a CSE and again received the handout on procedural safeguards for parents. Before the RIAT meeting, Joseph Serio, the school psychologist, spoke with Mrs. P. about her concerns with Krista, which included writing, reading, processing, social studies and the achievement-ability discrepancy in Krista's test results. Serio also spoke with Krista's teachers who reported no concerns and circulated a form among the teachers to report Krista's current performance.

On December 18, 2000, the RIAT team met to discuss Mrs. P.'s referral. Krista's teachers, Principal Kathleen Sturges, Serio and the school social worker participated. The team reviewed Krista's grades, her recent standardized test scores, the MDC reports from the 1996 and 1999 CSEs, Krista's current Section 504 plan, current academic performance and her teacher's social well-being observations. The team observed that Krista had average to above-average grades in all subjects and Bs in reading and language arts. In fact, Krista's reading grade had

9

improved from a B to a B+ in the second quarter. Krista's math teacher, who is certified in learning disabilities and social emotional disorders, informed the team that she did not think there was any need to provide Krista with special services because she was earning As and Bs, grasped concepts well and finished assignments without taking them home. In addition, because Krista made the honor roll during the first quarter, the team concluded that any possible learning problems in the previous evaluations were not impacting Krista's current educational progress.

Although Krista's science teacher, Ginger Woolsey, later testified at the due process hearing that she spent extra time with Krista during study hall because Krista was a slow writer and had problems with organization in her written work, the Profile Form reviewed during the RIAT meeting did not contain any "minus" marks in science indicating that Krista was having difficulties. In fact, Krista's teachers opined on the Profile Form that Krista was doing well or average in most areas except in attentiveness during math class. Krista's math teacher testified that Krista's inattentiveness was probably due to her boredom because the class was not moving quickly enough for her.

Krista's ISAT score in reading placed her in the top quarter percentile; her writing score was "within the state average" but lower than the school average. (*Id.* at 1353, Serio Testimony at 360.) Again, the IQ tests revealed a discrepancy between Krista's verbal IQ of 101 and her performance (non-verbal) IQ of 121. As Serio interpreted these scores, Krista showed above average intelligence in visual motor and reasoning skills, but as a whole, had average verbal skills. Further, he noted that Krista achievement scores were within the average range and thus commensurate with her average verbal IQ, which he believed was a stronger predictor of academic achievement than performance IQ. Finally, the team discussed Krista's social well-

being. Krista was reported to fit in nicely with her peers. Mrs. DeCaprio, Krista's language arts teacher, further testified at the hearing that Krista was very willing to share answers and spoke with great confidence.

In light of their review of all the relevant materials, the RIAT team concluded that another CSE was not necessary and that the Section 504 plan seemed to be meeting Krista's needs. The team further agreed to continue to monitor Krista's progress throughout the school year and to discuss her progress if the need arose. Serio notified Krista's parents of the team's decision not to evaluate Krista by a written form and memorandum explaining the reasons for the team's decision. The form requested that Mr. and Mrs. P. review their rights and call Dr. Rebecca Fries, the Special Education Director, with any questions; the memorandum also noted the specific pages of the attached guide that described the process for requesting a due process hearing.

Although Mrs. P. testified that she had concerns about her rights at that time, she did not request a due process hearing to appeal the RIAT team's decision denying Krista another CSE. Rather, she requested a meeting with Krista's teachers to discuss Krista's academic progress and her concern with Krista's attending and processing skills and possible dyslexia. Because of Mrs. P.'s concerns, the staff decided to conduct classroom observations of Krista. Serio observed Krista in social studies for an hour where he noted that she eagerly participated in discussions, attended well and finished a short answer test in the allotted time; the school speech pathologist made similar observations in Krista's language arts class.

At Mrs. P.'s request, another RIAT meeting was held on February 8, 2001 with Krista's teachers, Principal Surges, Serio and speech pathologist Lisa Stevens. Krista's teachers reported that she was doing well and earning average or above-average grades. Mrs. DeCaprio noted that

11

while Krista's writing skills were weak, they had improved since the beginning of the year. In addition, she thought that Krista could master the sixth grade language arts curriculum. Mrs. DeCaprio further testified at the due process hearing that Krista made spacing, sequencing, spelling errors and errors common among sixth grade students, but that she had not noticed that Krista rotated letters (*e.g.,* wrote a "d" as a "b"). Mrs. DeCaprio opined, based on her experience working with a dyslexic student, that Krista's work did not exhibit many of the kinds of errors she thought typical of dyslexia. Further, although she had difficulty understanding some of Krista's sentences, Mrs. DeCaprio also testified that Krista wrote well-organized papers on occasion. Mrs. Stevens, a speech pathologist trained to detect language disorders, reported that Krista's listening and attending skills were very good. In addition, Mrs. P. gave Mrs. Stevens a couple of Krista's work samples which she reviewed; Stevens did not see anything that would suggest a language disorder such as dyslexia. The team also addressed Krista's ADHD, noting that Krista was not taking medication for ADHD at the time. Mrs. P. received a copy of the RIAT report at the conclusion of the meeting. Principal Surges also informed Mrs. P. that the staff would continue to monitor Krista and hold another RIAT meeting if any teachers expressed concerns with Krista's work. Following the February 8, 2001 meeting, none of Krista's teachers requested a team meeting to discuss Krista's progress. Stevens also followed up with all of Krista's teachers, except her gym teacher, on at least two occasions, and they reported that Krista was doing well.

## II. Krista's Due Process Hearing

Following the February 2001 RIAT meeting, Parents again failed to request a due process hearing to challenge the RIAT's decision not to conduct a third CSE, but instead on

approximately March 3, 2001, they requested an IEE at public expense. Subsequently on March 6, 2001, the District sent the ISBE a request for a due process hearing to deny Parents' request for an IEE at public expense. Mrs. P. sent her own list of issues, facts and requested relief to the appointed HO on March 28, 2001. Shortly thereafter, Parents obtained legal representation through VOICE, a parent training, information and advocacy organization. On April 10, 2001, HO Friedman held a pre-hearing conference with Parents, attorneys and Dr. Fries. The pre-hearing conference report states that Parents were considering pursuing their own independent educational evaluation of Krista and were making a counter-request for a due process hearing. The case was then continued until April 20, 2001 for a status hearing regarding the independent evaluation. On April 18, 2001, Parents submitted an amended list of issues and requested relief to the HO.

Just prior to the April 20 pre-hearing conference, Parents requested that the HO issue an expedited order that the District conduct an IEE and "provide prior written notice as detailed in federal and state regulations for each instance it was required but not provided in the past." (*Id.* at 344.) The District responded to Parents' request for an IEE by arguing that Parents were not entitled to an IEE prior to a hearing on the merits. On April 27, 2001, HO Friedman issued an interim order denying Parents' requests for an IEE and prior written notice; she noted, however, that Parents had a right to pursue their own evaluation.

The hearing convened on May 2, 2001 and continued sporadically through 2001. The HO heard testimony from: Parents; school staff, including school psychologists Wheaton and Serio, Principal Butters and speech pathologist Lisa Stevens; a number of Krista's teachers throughout the years; and Dr. MeShelda Jackson and Alice Vaught, two witnesses retained by Parents. As

13

noted above, relevant testimony from many of these witnesses is included in the educational history set forth above.

Parents introduced testimony of Dr. MeShelda Jackson on May 9, June 1 and November 20 and Alice Vaught on May 9 and June 1. In April 2001 Parents retained Dr. Jackson, who has a Ph.D. in special education and psychology, and Vaught, a private educational consultant with masters degrees in reading and learning disabilities, to review the MDC reports from the first and fourth grade as well as some of Krista's work samples. Both Dr. Jackson and Vaught concluded that the District had not fully assessed Krista's difficulties in writing, that Krista was not performing at the sixth grade level and that further diagnostic testing of Krista's writing abilities was necessary. Vaught specifically testified that she thought it unlikely that Krista could write three to five paragraphs successfully without assistance and thus meet the school's standards. Dr. Jackson and Vaught's recommendations at the hearing were based on a review of the MDC reports from 1996 and 1999, an interview with Mrs. P. and selected work samples provided by Mrs. P. Vaught admitted that she did not know that Krista was receiving Section 504 accommodations.

Dr. Jackson and Vaught also testified that while they believed Krista had a learning disability, not all students with disabilities qualify for special education services. As Dr. Jackson conceded, special education is not always required to meet a student's needs. Dr. Jackson felt that she could not make a determination as to whether Krista required special education because she felt she needed more information on whether Krista's written expression interfered with her ability to perform in all subjects. Dr. Jackson also testified that the District retains broad discretion to decide what criteria should be used to refer a student for a CSE. Thus, although she

14

disagreed with the District's decision not to conduct a third CSE, she opined that the District did what it was required to do to determine eligibility.

On July 24, 2001, Parents' attorney presented a motion to admit the report of Dr. Nowinski, who along with her associates had conducted an evaluation of Krista beginning in May 2001. District's counsel received by fax copies of the Nowinski report and the motion to admit and allow testimony of Dr. Nowinski's associate Drina Madden on July 21, 2001. At the hearing, the District objected to Madden testifying to the items in the report because she was not a licensed school or clinical psychologist and because her special education certification in the area of early childhood education was not relevant to Krista's case. In considering the motion, the HO noted that the testing had commenced while the hearing was pending. Accordingly, she expressed concern that the hearing possibly should have been continued and the District apprised of the independent evaluation.[5] HO Friedman ruled that she would allow Dr. Nowinski's report into evidence only if the doctor testified at the hearing so as to allow the District an opportunity to cross-examine her. HO Friedman also rejected Parents' attorney's offer of proof as to what Madden would testify to regarding the Nowinski report, ruling that she thought a certified person should testify regarding the report. Finally, HO Friedman ordered that an IEE be conducted in

---

[5] HO Friedman specifically stated: "There's some sort of outside agenda that has nothing to do with Krista. I am here specifically because of one child, Krista. I'm not here because of other things that voices might have some questioning [sic]. Even the testimony that we've had of witnesses has led me to believe that there's some sort of outside agenda. We're here only for one child and one child alone. I feel that you didn't come forward. I'm certainly at this point not inclined to leave this out, but I just feel that it's kind of egregious how this came about. I have to tell you that it's most annoying to me. If she was in on 5-29 to see for some of the testing, I would think you would have come forward and say we were so lucky now we have an appointment. Why didn't you?" (*Id.* at 1521-22.)

the fall by a completely independent entity and that the District be given time to conduct a MDC to consider the evaluation.

On August 10, 2001, the District moved for reconsideration of the July 24 order to complete an IEE, and the issue was fully briefed by the Parents and the District. On September 4, 2001, HO Friedman ruled during a teleconference that the Nowinski report and any testimony regarding the report would not be admitted and withdrew her previous order for an IEE. HO Friedman's decision to vacate the order for an IEE was reflected in a written decision issued on November 18, 2001. She noted that the IEE had been commenced without her knowledge or notice to the District, and that the threshold issue—whether the District appropriately denied Parents' third request for a CSE—needed to be decided before determining whether Parents were entitled to an IEE at public expense. The hearing resumed and concluded on November 19, 2001. Both parties timely submitted their post-hearing briefs, but District's counsel received Parents' reply, without enclosures, a day late on January 15, 2002, with a complete reply following on January 17, 2002. The District accordingly informed HO Friedman of the tardy reply and requested that she disregard the attached article by Dr. Betsy Waterman on the necessity of a portfolio assessment in identifying a student's skills and deficits.

## III. The Hearing Officer's Decision

On January 31, 2002, HO Friedman issued her Decision and Order, which included an order that: "(1) [t]he case study evaluations of Student conducted by the District in February 1996 and January 1999 were appropriately comprehensive and met the standards contained in the applicable state and federal regulations; (2) [t]he District's denial of the Parents' request for a case study evaluation in December 2000 was appropriate; (3) [t]he Parents are not entitled to an

independent educational evaluation at public expense; (4) [t]he District did not violate the Parents' procedural rights under the IDEA and Illinois law as it provided adequate prior written notice under 34 C.F.R. 300.503 and 23 Ill. Adm. Code § 226.160(d); (5) [t]he District did not violate its Child Find responsibility under 23 Ill. Adm. Code § 226.100 when it failed to find Student eligible for special education services; (6) [t]he RIAT team shall reconvene within 30 days to review any independent educational evaluations and reports, not already considered, to determine if these reports at all impact on the decisions of both the RIAT and MDC teams to find Student ineligible for special education and related services; and (7) the District shall encourage Student to take full advantage of the accommodations in her Section 504 Educational Plan through positive reinforcement. In addition, the current Section 504 Educational Plan shall be reviewed to determine if it needs to be revised to meet some of Student's problems with disorganization." (*Id.* at 29-31, HO's Decision and Order.)

HO Friedman also held the Waterman article inadmissible because it was not submitted at the hearing or in Parents' brief, which would have allowed the District an opportunity to respond, and because it was partly illegible.[6] Parents moved for clarification of the order on February 11, 2002 and on February 24, 2002, HO Friedman clarified the date by which the RIAT team was to reconvene, but found the remaining requests to be either requests for reconsideration or beyond

---

[6] As Parents' attorneys point out in their statement of facts, the Waterman article was cited in Parents' post-hearing brief, which would have given the District the opportunity to respond in their written reply. However, Parents' supposed failure to cite the article in their brief was not the HO's only grounds for deeming the article inadmissible; the HO opined that it should have been submitted at the hearing, and in any case, it was partly illegible. (*Id.* at 17, HO Decision and Order.) Therefore, the HO's error is of little consequence.

the scope of her decision. On May 31, 2002, Plaintiffs filed a complaint seeking judicial review of the HO's decision.

## LEGAL STANDARDS

The standard of review in IDEA cases is unique. In deciding this motion for summary judgment, the Court bases its decision on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B)(iii). We must give "due weight" to the hearing officer's findings, a standard that is more stringent than the substantial evidence standard but less than *de novo* review. *Heather S. v. Wis.*, 125 F.3d 1045, 1052 (7th Cir. 1997). The Seventh Circuit describes the standard of review in IDEA cases as a sliding scale, with a more searching review necessary the greater the amount of new evidence submitted to the court. *Sch. Dist. of Wis. Dells v. Littlegeorge*, 295 F.3d 671, 675 (7th Cir. 2002). When no new evidence is submitted, the court owes considerable deference to the hearing officer. *Id.* (noting that this is basically the clear-error or substantial-evidence standard). In this case, the Court admits little additional evidence and thus our review is deferential. We may not "substitute [our] own notions of sound educational policy for those of the school authorities which [we] review." *Bd. of Educ. of Cmty. Consol. Sch. Dist. 21 v. ISBE*, 938 F.2d 712, 715-16 (7th Cir. 1991) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). Thus, while we independently evaluate the testimony and evidence, we defer to the findings of hearing officers who have expertise in educational policy. *Heather S.*, 125 F.3d at 1052-53. Purely legal questions, however, we review *de novo*. *Morton Cmty. Unit Sch. Dist. No. 709 v. J. M.*, 152 F.3d 583, 588 (7th Cir. 1998).[7]

---

[7] We reject Plaintiffs' argument that this Court should conduct a *de novo* review of the HO's decision due to her alleged extreme bias. As an initial matter, Plaintiffs have not come forth with supported allegations of bias on the part of HO Friedman. Some of the allegations of

# ANALYSIS

## I. Motions to Admit Additional Evidence

Both parties urge the Court to receive additional evidence pursuant to 20 U.S.C.

§1415(i)(2)(B)(ii). While the subsection authorizes the Court to hear additional evidence at the

request of a party, "additional" is construed as "supplemental." *See Reed v. Lincoln-Way Cmty.*

*High Sch. Dist. No. 210*, No. 98 C 4934, 2000 WL 696793, at *5-6 (N.D. Ill. May 30, 2000)

(citing *Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd*, 471 U.S. 359

(1985)). Thus, we might in our discretion allow additional evidence, for example, to fill "gaps in

the administrative transcript owing to mechanical failure, unavailability of a witness, [or] an

improper exclusion of evidence by the administrative agency, and evidence concerning relevant

events occurring subsequent to the administrative hearing." *Burlington*, 736 F.2d at 790. We

must be careful, however, that the admission of evidence does not transform our deferential

---

bias are completely unsupported and speculative, (*see* R. 41, Pls.' Mem. at 12), others are irrelevant to the HO's decision and conduct at the hearing and inadmissible (R. 42, Pls.' Mot. to Admit, Ex. 4, Nally Aff.) and the remainder are without merit.

The Court carefully reviews any allegations of bias and notes that a substantial showing of personal bias might render an administrative decision unfair. *See, e.g., Kattan by Thomas v. D.C.*, 691 F. Supp. 1539, 1546-47 (D.D.C. 1988). Plaintiffs rely largely on *Kattan* where the plaintiffs sought to enjoin a hearing officer from participating in any future hearings, alleging that she was openly belligerent, prevented them from conducting cross-examination and assisted the defendants' witnesses in formulating their answers. Plaintiffs' reliance on *Kattan*, however, is not persuasive. In that case, the court conceded that the officer's manner was abrupt, but noted that adverse rulings do not connote personal bias and rejected the plaintiffs' request to enjoin. *Id.* In this case, Plaintiffs cannot even show an abrupt manner. Furthermore, HO Friedman's expressions of dismay with Plaintiffs' attorneys and her rulings against Plaintiffs, including her ruling not to allow the Nowinski report and Waterman article into evidence and her ruling reversing her order for an IEE upon reconsideration, do not establish personal bias. *Id.* at 1547; *Liteky v. United States*, 510 U.S. 540, 555-56 (1994). Our review of the record reveals that the HO soundly supported her rulings. In short, Plaintiffs have not come forth with any supported allegations of bias such that a more searching review is necessary.

review into *de novo* review. *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901 (7th Cir. 1996) (citing *Burlington*, 736 F.2d at 791).

In light of these standards, the District's motion to admit is granted in part and denied in part. Although the affidavit of Mary Kay Klimesh, the District's attorney, is somewhat redundant of the material already in the record, it does fill in some gaps and thus is admitted. The Nowinski report is attached to Klimesh's affidavit and thus also is admitted for the limited purpose of reviewing the HO's decision not to admit the report into evidence. The affidavits of Dr. Fries and Principal Surges, however, are not admitted as they contain information not relevant to our review of the HO's decision.

Plaintiffs' motion to admit is denied. The Court questions the relevance of the September 10 and 11, 2001 letters and notes that they contain inadmissible hearsay. Krista's April 2001 California Achievement test scores are also not admitted because Plaintiffs have not shown that they were a factor in the HO's decision. The Nowinski report has already been admitted for the limited purpose stated above. Neither Dr. Jackson's Test of Written Expression report from February 2002 nor Mrs. P.'s authenticating affidavit are admitted because the test was completed after the hearing and the HO's decision. Plaintiffs' index to the administrative record also is not admitted because it is not the type of supplemental evidence admissible under § 1415(i)(2). Keeping in mind the deferential standard of review, the Court declines to admit the article on ADHD which could have been submitted to the HO. Finally, we conclude that the affidavit of Mike Nally is irrelevant and thus we decline to admit it. The affidavit outlines a conversation between Nally and HO Friedman that occurred on April 22, 2002 where HO Friedman allegedly criticized Plaintiffs' attorney Thomas and VOICE. As a preliminary matter, Nally's retelling of

Friedman's statements is inadmissible hearsay under the Federal Rules of Evidence. Fed. R. Evid. 801. Further, even if the Court were to admit Nally's affidavit, the HO's alleged comments occurred several months after the conclusion of the hearing and decision in Krista's case and thus are not relevant to showing bias on the part of the HO during Krista's hearing. At most, the alleged comments evidence that the HO might have had a negative opinion of Thomas and VOICE after the hearing. This, however, does not translate into bias against Krista and her attorneys such that the result of the hearing was affected. In fact, the HO represented that she was there on Krista's behalf, *see supra* n.5, and we trust that the HO's decisionmaking process was unaffected by bias. Thus, even if Nally's affidavit were admissible, it is insufficient to establish bias during the time the HO decided Krista's case.

## II. Substantive Claims

Plaintiffs challenge various aspects of the HO's decision, arguing that the HO wrongly decided many key issues including that: (1) the denial of a CSE for Krista in 2000 was appropriate; (2) the 1996 and 1999 CSEs were comprehensive and met federal and state standards; (3) Krista was entitled to an IEE at public expense; (4) the District violated its child find responsibilities under federal and state statutes regulations; and (5) the District provided adequate prior written notice under federal and state regulations.[8] The District, in turn, argues that it complied with relevant federal and state statutes and that the HO reached the appropriate

---

[8] Plaintiffs also briefly allege that the District failed to assess Krista for assistive technology services. The District does not respond to this argument. The Court dismisses as unsupported Plaintiffs' argument that Krista should have been assessed for assistive technology services. The regulations and caselaw cited by Plaintiffs do not support the argument that this assessment is required when a CSE is conducted. Rather, Plaintiffs' legal support suggests that this assessment should be made when formulating an IEP for a child disabled under the IDEA.

conclusion in determining that the District had met its obligations to Plaintiffs. After an independent review of the administrative record and the admitted additional evidence, while giving due weight to the determinations of the HO, the Court concludes that a preponderance of the evidence supports the HO's decision.

First, the record evidence supports the HO's determination that the District's denial of another CSE in 2000 was appropriate. Plaintiffs primarily argue that the denial of a third CSE was inappropriate because the District failed to consider all the areas of need and provide adequate programming for Krista's alleged writing problem. Our review of the evidence, however, reveals that the HO's decision is supported by a preponderance of the evidence. As the HO noted in her decision, the District is responsible for deciding whether to conduct a CSE and *may* utilize data and procedures such as "observation of the child, assessment for instructional purposes, consultation with the teacher or other referring agent, and a conference with the child" in making its determination. 23 Ill. Admin. Code § 226.110(c).

In this case, the District utilized nearly all these tools in deciding that another evaluation of Krista was not appropriate. School psychologist Joseph Serio consulted with Mrs. P. about her referral and with Krista's teachers who reported no concerns. The school also held a RIAT meeting on December 18, 2000 with Krista's teachers, Principal Sturges and the school social worker to discuss the referral. The team reviewed: Krista's grades, which were average to above-average; recent standardized test scores, also in the average range; Krista's current Section 504 plan; the MDC reports from the 1996 and 1999 CSEs; and Krista's teachers observations.

In her decision, the HO noted the breadth of materials reviewed at the December 2000 RIAT meeting and also discussed the testimony of two of Parents' witnesses, Dr. Jackson and

Vaught. Plaintiffs emphasize that Dr. Jackson and Vaught both recommended further diagnostic testing of Krista's writing ability. The HO, however, discounted their testimony because they had not interviewed, tested or evaluated Krista. Their recommendations were based on Krista's past CSEs and MDC reports, an interview with at least one parent and work samples provided by Mrs. P. The HO also noted that at least one witness was unaware that Krista was receiving Section 504 accommodations. Hearing officers are entitled to weigh evidence and make credibility determinations and the HO's reasons for not crediting Jackson and Vaught's testimony in its entirety are reasonable ones that we are reluctant to disregard. *Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21,* 938 F.2d at 718 (noting that hearing officers are in the best position to make credibility determinations in the first instance and that their findings are thus entitled to "due weight" by a district court on appeal). Furthermore, although Plaintiffs would have us rule otherwise, the testimony of expert witnesses, especially ones who have not even interviewed or tested a child, should not necessarily be weighed more heavily than that of teachers and school officials who have personally observed and tested a student. *See, e.g., Douglas W. v. Greenfield Pub. Schs.,* 164 F. Supp. 2d 157, 167-69 (D. Mass. 2001) (affirming the hearing officer's weighing of teachers' testimony over experts' testimony).

To further dispute the denial of a 2000 CSE, Plaintiffs also point to the hearing testimony of science teacher Ginger Woolsey that Krista had problems with organization in her writing and with her writing generally. The HO, however, questioned Woolsey's credibility because she had not been retained by the school for the following year. Again, the HO is in the best position to make credibility determinations and weigh evidence, which included testimony from the remainder of Krista's teachers that she was doing well. *Bd. of Educ. of Cmty. Consol. Sch. Dist.*

*No. 21*, 938 F.2d at 718. Therefore, we conclude that the evidence supports the HO's decision that the denial of a 2000 CSE was appropriate. The HO noted the District's obligation to conduct a CSE, examined the evidence that was presented at the December 2000 RIAT meeting, heard testimony from witnesses and weighed the evidence. Our review of the record reveals that her decision is supported by a preponderance of the evidence.

Second, in discussing the propriety of the 2000 CSE denial, the HO also discussed the 1996 and 1999 CSEs, concluding that the evaluations were proper under 34 C.F.R. §§ 300.532-533 and 23 Ill. Admin. Code § 226.130. While Plaintiffs argue that these evaluations did not appropriately address Krista's performance and inappropriately compared Krista to her peers, we conclude that the HO's decision was reasonable and supported by the evidence.

The federal regulations governing evaluation procedures, 34 C.F.R. §§ 300.532-300.533, provide the minimum requirements for an evaluation. The tests and other evaluation materials must be non-discriminatory and conducted in the student's native language by trained and knowledgeable personnel. *Id.* at § 300.532(a)(1) and (c)(1). The evaluation must also include tests and other evaluation materials tailored to assess specific areas of educational need and not simply provide a single general intelligence quotient. *Id.* at § 300.532(d). The child must also be assessed in all areas related to the suspected disability. *Id.* at § 300.532(g). Finally, no single procedure should be used as the sole criterion for determining whether a child has a disability. *Id.* at § 300.532(f). In evaluating the data, the MDC team or its equivalent should review the existing evaluation data on the child, including evaluations and information provided by the parents, current classroom-based assessments and observations by teachers and related service

providers. *Id.* at § 300.533(a)(1). The relevant state regulations are largely duplicative of the federal regulations. *See* 23 Ill. Admin. Code § 226.130.

A preponderance of the evidence certainly supports the HO's determination that the 1996 and 1999 CSEs were appropriate. The 1996 CSE was comprehensive, *see supra* n.4, and included culturally non-discriminatory tests administered by school psychologist Wheaton in English, Krista's native language. The CSE also included not only an IQ test, but an achievement test and visual motor integration test as well as a psychological evaluation. The MDC convened to review the evaluation results included Mrs. P., Wheaton, Krista's teachers and a special education teacher. The team discussed the results of the tests, the teachers' observations as well as the psychologist's and parent's observations. In evaluating the test results, the District also appropriately compared Krista's ability with her achievement scores, and did not simply compare her performance to that of her peers. Finally, the decision to find Krista ineligible for special education services was not based on a single criterion.

In addition, the second CSE in 1999 complied with federal and state regulations. The District conducted speech, language and psychological evaluations, including standardized tests, as well as an evaluation of Krista's educational and learning processes. The MDC reviewed all the components of the CSE as well as Krista's current performance. Again, the MDC properly addressed Krista's achievement-ability discrepancy, and did not use an inappropriate peer standard as the basis of its decision.[9]

---

[9] In addition to arguing that the District utilized an inappropriate peer standard, Plaintiffs also argue that Krista's grades were not indicative of her performance because she did "re-do's" and received homework assistance from Mrs. P. The teams that convened to review Krista's Section 504 plan and eligibility for special education determined that with accommodations such as "re-do's", Krista was able to achieve in school. While Krista's grades might have reflected

This compliance with the regulations was duly noted by the HO. The HO relied not only on the fact that the tests were administered in English, Krista's native language, but that they were "technically sound . . . used to assess the relative contributions of cognitive, behavioral, physical and developmental factors . . . administered by certified school psychologists and the school social worker . . . [and] used to assess specific areas of educational need." (R. 30-31, Admin. R. at 27, HO Decision and Order.) Thus, the HO found that the District had proven that past CSEs were comprehensive, a determination supported by our review of the record.

Third, we conclude that the HO did not err in concluding that Krista was not entitled to an IEE at public expense. Plaintiffs disagree with the HO's interpretation of relevant federal and state regulations that Plaintiffs are not entitled to an IEE at public expense after a denial of a request for a CSE. The regulations state in pertinent part:

### § 300.502 Independent educational evaluation.

(a) *General.* (1) The parents of a child with a disability have the right under this part to obtain an independent educational evaluation of the child, subject to paragraphs (b) through (e) of this section.

* * *

---

some "re-do's", Krista was nevertheless achieving as evidenced by test results. The teams' decisions that Krista was achieving were not based simply on grades, but on reports and observations by teachers and other school professionals and standardized tests.

Further, the record is not clear as to how much homework assistance Krista was receiving and when. Mrs. P. testified in July 2001 that she spent about three hours a night helping Krista with homework. The school psychologist at Krista's junior high school testified that the RIAT team took this homework assistance into account. Furthermore, this does not appear to be a case where modifications and service augmentation mask severe academic weaknesses. *See Letter to Lillie/Felton*, 23 Indiv. with Disabilities Educ. Law R. 714 (May 10, 1994) (offering as an example a student who receives As and Bs but dictates most written work to a parent, takes all tests orally and reads all class work to the teacher because the teacher cannot understand what the student has written).

(b) *Parent right to evaluation at public expense.* (1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency.

34 C.F.R. § 300.502.

## § 226.180 Independent Educational Evaluation

Parents have the right to obtain an independent evaluation of their child, subject to the provisions of the Section.

* * *

(b) If the parents disagree with the district's evaluation and wish to obtain an independent educational evaluation at public expense, they shall submit to the local school district superintendent a written request to that effect.

23 Ill. Admin. Code § 226.180.

According to the HO's interpretation of the regulations, Parents were not entitled to an IEE because the District did not conduct an evaluation, or CSE, of Krista in 2000. The HO read the regulations as providing an IEE at public expense only if the parents disagreed with the results of a CSE. As the HO reasoned: "The Parents request for IEE was not prompted by their dissatisfaction with a specific CSE, but instead came after the District denied their request for a CSE. There is nothing in the law which entitles the Parents to an IEE at public expense after a denial of a request for an CSE." (R. 30-31, Admin. R. at 22, HO Decision at 8.)

The HO did not err in ruling that Parents had not met the prerequisite for requesting an IEE. A parent has the right to an IEE at public expense only "if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b). "Evaluation" is defined in the regulations as the "procedures used in accordance with §§ 300.530-300.536 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." 34 C.F.R. § 300.500(b)(2). The District did not conduct an

evaluation of the type detailed by these regulations in 2000. Rather, the RIAT team met to discuss Krista's performance in December 2000, in accordance with their obligations under 23 Ill. Adm. Code § 226.110. In short, there was no evaluation, as that term is defined in the regulations, to disagree with because the District decided that another CSE was not warranted. Therefore, the HO soundly ruled Parents' right to an IEE at public expense was not triggered.

Finally, we reject Plaintiffs' argument that the HO erred in concluding that the District provided adequate prior written notice to Parents and complied with their child find responsibilities. Specifically, the HO determined that Parents were not entitled to "prior written notice" under 34 C.F.R. § 300.503 because Krista had not been identified as disabled.[10] In support of her decision, the HO cited *Farrell v. Carol Stream School District No. 25*, 1996 WL 364743 (N.D. Ill. June 27, 1996). In *Farrell*, the district court discussed the requirement for "prior written notice" in circumstances akin to Krista's case—when a district refused to evaluate a student based on the belief that earlier evaluations finding the student not disabled were

---

[10] The federal regulation states in pertinent part:
**§ 300.503 Prior notice by the public agency; content of notice.**
(a) *Notice.* (1) Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability . . .
\* \* \*
(b) *Content of notice.* The notice required under paragraph (a) of this section must include–
(1) A description of the action proposed or refused by the agency;
(2) An explanation of why the agency proposes or refuses to take the action;
(3) A description of any other options that the agency considered and the reasons why those options were rejected;
(4) A description of each evaluation procedure, test, record or report the agency used as a basis for the proposed or refused action;
(5) A description of any other factors that are relevant to the agency's proposal or refusal;
(6) A statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained; and
(7) Sources for parents to contact to obtain assistance in understanding the provisions of this part.

appropriate. *Id.* The *Farrell* court found compelling the holding of a New York district court that prior written notice in these circumstances was not warranted, but declined to base its dismissal on these grounds. *Id.* at *5 (citing *Hiller v. Bd. of Educ.*, 743 F. Supp. 958, 969 (N.D.N.Y. 1990)). Whether "prior written notice" is required in these circumstances appears to be an unsettled question, but the HO's interpretation of the regulation, supported by *Farrell* and *Hiller*, is a reasonable one that we will not disturb.

Furthermore, the HO went one step further in finding that even if Parents were entitled to prior written notice, the District had provided it to Parents, in accordance with the applicable federal regulation, 34 C.F.R. § 300.503, and virtually identical state regulation, 23 Ill. Admin. Code § 226.520, after the ineligibility determinations in 1996 and 1999 and the RIAT team decision in 2000. We agree that if prior written notice was indeed required, the record supports a finding that the District provided it. After the 1996 MDC, Mrs. P received a copy of the MDC report that contained a description of the action refused and the reason for it, along with a description of all the tests and materials used as a basis for the team's decision. Mrs. P. also received a Parent Notification of Conference Recommendations form that requested that Parents notify the school principal with questions. Another explanation of parents' rights was also attached to the form. Mrs. P. received the same type of notice following the MDC in January 1999, and also received written notice of the RIAT team's December 2000 meeting.

As a final matter, the HO's decision that the District met its child find responsibilities under 23 Ill. Adm. Code § 226.100 is also supported by the record. The state regulations require, *inter alia*, an "[o]ngoing review of each child's performance and progress by teachers and other professional personnel, in order to refer those children who exhibit problems which interfere with

their educational progress and/or their adjustment to the educational setting, suggesting that they may be eligible for special education and related services." 23 Ill. Adm. Code § 226.100(a)(2). As noted by the HO, the District conducted two CSEs, each followed by a MDC, as well as RIAT meetings in December 2000 and February 2001. In short, the record is replete with evidence documenting teachers and school officials' continual review of Krista's performance. This is not a case where a school district shirked its responsibility in identifying a child in need of special education.

## CONCLUSION

The Court, although not without empathy for Parents and Krista, concludes that the HO's decision was supported by a preponderance of the evidence. Therefore, Plaintiffs' motion for summary judgment is denied and the Court grants summary judgment to the ISBE and the District. (R. 41-1.) In addition, the District's motions to admit and to strike are granted in part and denied in part. (R. 51-1; 52-1.) Plaintiffs' motion to admit evidence is denied. (R. 42-1.) The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Defendants.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 2, 2003**

30